**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

QUAUNTEL SAUNDERS,                     )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        **Civil Action No. 5:21-00322**
                                       )
LT. BURTON, *et al.*,                  )
                                       )
            Defendants.                )

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is Defendants' Motion for Summary Judgment (Document No. 40), filed on December 29, 2021. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendants' Motion and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by the Defendants in moving to dismiss. (Document No. 42.) Plaintiff filed his Response in Opposition on January 26, 2022, and Defendants filed their Reply on February 4, 2022. (Document Nos. 44 and 46.) Having examined the record and considered the applicable law, the undersigned has concluded that Defendants' Motion for Summary Judgment should be granted in part and denied in part.

## PROCEDURAL BACKGROUND

On June 1, 2021, Plaintiff, acting *pro se*,[1] filed a Complaint seeking relief for alleged violations of his constitutional rights pursuant to 42 U.S.C. § 1983. (Document No. 2.) Plaintiff names the following as Defendants: (1) LT Burton; (2) CO Hood; (3) CO Pauley; (4) CO

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Houchins; (5) CO Walters;[2] (6) CO Bowyer; (7) CO Cox; (8) CO Witt; (9) Lt. Lilly; (10) Capt.

Warden; (11) Capt. Dillion; (12) Lt. Cook; (13) Capt. Athy; (14) Lt. Burnett; and (15) Warden

Francis. (Id.) Plaintiff alleges that Defendants violated his Eighth Amendment rights by acting

with deliberate indifference to his safety and subjecting him to unconstitutional conditions of

confinement. (Id.) Plaintiff alleges that he got into a fight with a correctional officer on January

27, 2020. (Id.) In response, Plaintiff states that Officers Burton, Hood, Pauley, Houchins, Walters,

Bowyer, and Cox took him "to the ground and sprayed" him with pepper spray. (Id., p. 4.) Plaintiff

alleges he was then taken to an interview room where Officer Burton threaten Plaintiff. (Id.)

Specifically, Plaintiff alleges that Officer Burton stated as follows:

> Give me one good reason I shouldn't jump over this table and f**k you up badly
> this time. If it weren't Monday morning with courts and all the important people
> here, I'd take you in medical were there are no cameras, and we would kill your fat
> ass. You know that don't you? Draw blood on my officer, we kill you.

(Id.) Plaintiff acknowledges he was then taken to medical. (Id.) Plaintiff states that he requested to

wash the pepper spray off, and medical staff informed him "they will put you in the shower soon

but they should have already done that." (Id.) Plaintiff contends when he was taken to segregation,

inmates made the following comments: "Is that him? Put him in my cell. I want to get out. I get a

free pass." (Id.) Plaintiff alleges that he was first placed in a cell with Inmate Emanuel Jones. (Id.)

Plaintiff states that he asked the "working officer" if he could get a shower and change of clothes,

and Officer Whitt responded "Hell no! You just assaulted an officer. F**k you!" (Id., p. 5.)

Plaintiff claims that Officer Whitt then called Inmate Jones to the cell door and stated the

---

[2] The Clerk is **DIRECTED** to revise the Docket Sheet to reflect "CO Walters" instead of "CO Waters" as a Defendant. Although Plaintiff indicates "CO Waters" in the heading of his Complaint, Plaintiff indicates "CO Walters" in the body of the Complaint. (Document No. 2, pp. 1 and 4.) Based on additional filings in the above case, it appears at "CO Walters" is the correct spelling.

following: "Do that and my word you'll get out today." (Id.) Plaintiff alleges that a short time later, Inmate Jones "began to punch and kick me in my head. I grabbed his leg and pulled him down, and we began to fight like dogs." (Id.) Plaintiff alleges that the other inmate in the cell yelled for help, and correctional officers opened the door and both inmates stopped fighting. (Id.)

Plaintiff alleges that he was then taken to another cell that was shared with Inmate Dixon. (Id.) Plaintiff claims that Inmate Dixon stated, "Hell no. I'm not having no celly and I'm damn sure not living with no ni*ger." (Id.) Plaintiff then requested that he be placed in another cell, but Officer Dillon responded as follows: "Oh you're going in there even if we have to throw you in there. You all both assaulted my staff; I don't care if y'all kill each other in there." (Id.) Plaintiff was placed in the cell with Inmate Dixon, who continued to threaten Plaintiff." (Id., p. 6.) Plaintiff alleges that Hearing Officer Scotty Moore came to his cell, and Plaintiff requested to be moved. (Id.) Plaintiff asserts that Officer Moore stated that "That's not up to me, it's not my call. Sorry." (Id.) Subsequently, Plaintiff contends that Inmate Jones came to his cell door and stated the following: "I had to do that because they said if I did that, they would let me out of the hole and not ad seq me for the knife." (Id.) Plaintiff contends that as soon as Inmate Jones left, Inmate Dixon punched him in the back of the head several times. (Id.) Plaintiff alleges that he yelled for help, but it took more than five minutes for a correctional officer to arrive at the cell. (Id.) Plaintiff contends that he informed the officer of the attack and then requested to be moved to protective custody. (Id.) Plaintiff alleges that the officer responded as follows: "Fight him like you fault the CO this morning . . . You just beat a CO up, now you're scared for your life? You are a bitch. I wish you would have put your hands on me! You are not leaving that cell. Now shut the f**k up whore." (Id., pp. 6 – 7.) Plaintiff contends that he then pressed the call button again reporting that

Plaintiff was in fear for his life, but no one took any action. (Id., p. 7.) Plaintiff further states that he pressed the call button several times to request a shower, but his requests were denied. (Id.) The following morning, Plaintiff complains that his food tray was slid on the floor under the cell door. (Id.) Plaintiff alleges that the floor was contaminated with feces and urine. (Id.) Plaintiff further alleges that Inmate Dixon told Plaintiff the following: "That is my tray. Don't eat it. I told you, you'll have to pay in trays to stay in this cell." (Id.) Plaintiff alleges that Inmate Dixon then "punched me in my head, I grabbed him and got him in the choke hold and held him till he was asleep." (Id.) Plaintiff states that he then reported the incident to officers and requested to be removed from the cell, but no action was taken. (Id., p. 8.) Plaintiff alleges that when Inmate Dixon "woke up," he continued to threaten Plaintiff. (Id.)

Plaintiff acknowledges that he was then removed from the cell for a "visit." (Id.) Plaintiff alleges that when Officer Burrnett was walking Plaintiff back to his cell, Plaintiff informed him that he feared for his life. (Id.) Plaintiff acknowledges that Officer Burrnett placed Plaintiff in a different cell. (Id.) Plaintiff complains that this cell "was freezing, the floor was flooded, the window didn't have any seals, that is where most of the water came from, . . . there was no running water at all." (Id.) Plaintiff alleges that he complained to officers, but no action was taken. (Id.) Plaintiff alleges that he was held in this cell for 24 hours a day, for numerous days, without working water to drink or wash his body. (Id., p. 9.) Plaintiff contends that "it wasn't until weeks later that I was able to finally shower, get clothes, and a cell with working water to drink." (Id.) Plaintiff alleges that Warden Francis and Capt. Athy walked through A-1 every week, and Plaintiff informed them of the foregoing. (Id.) Plaintiff again contends that no action was taken. (Id.) Plaintiff requests declaratory and monetary relief. (Id., p. 15.)

4

As Exhibits, Plaintiff attaches the following: (1) A copy of his "Inmate Grievance Form" dated December 30, 2020 (Id., pp. 19 – 20.); (2) A copy of his "Inmate Grievance Form" dated January 7, 2020 (Id., p. 21.); and (3) A copy of letters written by Plaintiff (Id., pp. 22 - 25).

By Order entered on June 2, 2021, the undersigned denied Plaintiff's Application to Proceed Without Prepayment of Fees and Costs and directed Plaintiff to pay the filing and administrative fee totaling $402.00. (Document No. 6.) On June 16, 2021, Plaintiff paid the filing and administrative fee totaling $402.00. (Document No. 7.) By Order entered on June 28, 2021, the undersigned directed the Clerk to issue process upon each named defendant. (Document No. 10.) On July 23, 2021, Defendants filed their Answer. (Document No. 15.) By Order entered on July 26, 2021, the undersigned set forth deadlines for the completion of discovery and the filing of dispositive motions. (Document No. 16.)

On December 29, 2021, Defendants filed their Motion for Summary Judgment and Memorandum in Support. (Document Nos. 40 and 41.) Defendants argue that Plaintiff's claims should be dismissed based on the following: (1) Defendant Burton is entitled to summary judgment because "Plaintiff has not developed any evidence of force used by the officer, and threats of violence are insufficient to support a Section 1983 claim" (Document No. 41, pp. 7 – 12); (2) "The excessive force claim should be dismissed as to all Defendants because Plaintiff acknowledges that all force used in C-1 was necessary and appropriate, and in response to Plaintiff's attack on Defendant Cox" (Id.); (2) "The living conditions citied by Plaintiff do not rise to the level of extreme deprivations necessary to prove an 8th Amendment violation" (Id., pp. 12 – 14.); (3) "Plaintiff has failed to establish that any Defendant was deliberately indifferent to a substantial risk of serious harm to the Plaintiff from the conditions of his confinement" (Id., pp. 14 – 15.); (4) "Plaintiff has failed to establish that any Defendant was deliberately indifferent to a known risk to

5

Plaintiff's safety from his cellmates" (Id., pp. 15 – 17.); (5) "Defendants are entitled to judgment

based on qualified immunity" (Id., pp. 17 – 18.); and (6) "Defendants cannot be liable under 42

U.S.C. § 1983 under a theory of supervisory liability" (Id., pp. 18 – 20.).

As Exhibits, Defendants attach the following: (1) A copy of the Incident Report prepared

by Defendant Burton (Document No. 40-1.); (2) A copy of the Incident Report prepared by Dakota

Hood (Document No. 40-2.); (3) A copy of the video of the incident (Document Nos. 40-3 and

43.); (4) A copy of the Incident Report prepared by Austin Bowyer (Document No. 40-4.); (5) A

copy of the Incident Report prepared by Tyler Pauley (Document No. 40-5.); (6) A copy of the

Incident Report prepared by Johnathan Walters (Document No. 40-6.); (7) A copy of the Incident

Report prepared by Benjamin Houchins (Document No. 40-7, pp. 1 - 3.); (8) A copy of the Incident

Report prepared by Kimberly Sturgill (Id., pp. 4 – 5.); (9) A copy of the Incident Report prepared

by Daniel Shipp (Id., pp. 6 - 7.); (10) A copy of the Incident Report prepared by Zachary Cox (Id.,

pp. 8 – 9.); (11) A copy of the transcripts of Plaintiff's deposition conducted on November 22,

2021 (Document No. 40-8.); and (12) Time stamped images of the incident (Document No. 40-

9.).

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to

Plaintiff on December 30, 2021, advising him of the right to file a response to Defendants' Motion

for Summary Judgment. (Document No. 42.) Plaintiff filed his Response in Opposition and a

Declaration in Support on January 26, 2022. (Document Nos. 44 and 45.) As an Exhibit, Plaintiff

attaches a copy of a screen shot image from the surveillance video time stamped 5:57:12 wherein

Plaintiff claims an officer can be seen pointing oleoresin capsicum ("OC") spray[3] in Plaintiff's

---

[3] OC spray is a chemical agent similar to what is commonly known as pepper spray, which causes irritation to a person's eyes, throat, and nose. See Park v. Shiflett, 250 F.3d 843, 849 (4th Cir. 2001)(describing the physiological effects of OC spray).

direction. (Id.) On February 4, 2022, Defendants filed their Reply. (Document No. 46.) As an

Exhibit, Defendants attach copies of time stamped, screen shot images from the surveillance video

following the alleged use of excessive force. (Document No. 46-1.) On February 22, 2022, Plaintiff

filed the Declaration of Inmate Hayden Dixon. (Document No. 48.)

## SUMMARY OF EVIDENCE

On January 28, 2020, Defendant Burton prepared an Incident Report detailing the events

that occurred on January 27, 2020 at approximately 5:56 a.m. (Document No. 40-1.) Specifically,

Defendant Burton described the incident as follows:

> On the above dated at 0556 hrs, I Lt. Nicholas Burton was working my assigned
> post Shift Commander at Southern Regional Jail and Correctional Facility. I
> responded to an officers assistance in C-1. When I arrived, Officers COII Tyler
> Pauley, COI Zachary Cox, and COI Austin Bowyer had [Plaintiff] on the ground in
> front of cell 4. Inmate [James Broyles] attempted to grab COI Z. Cox from behind.
> Cpl. Dakota Hood then delivered a burst of OC [spray]. Inmate Broyles backed
> away. I then ordered the section to lockdown multiple times. Inmate [Nicholas
> Johnson] began yelling and inciting the other inmates in the section. I then again
> ordered the section to lockdown and aimed to deploy my OC [spray] on the top tier
> due to the inmates not complying with my orders to lockdown. I then ordered COI
> Z. Cox to exit the section and go to Medical due [to] him bleeding from his facial
> region. [Plaintiff] was placed in mechanical wrist restraints and escorted to an
> Interview Room to await being cleared by Medical staff. I then review the video at
> 0530 hrs I observed [Plaintiff] in the front of the line when trays were passed in the
> section. [Plaintiff] sat his tray down on the table and began working out in the
> dayroom. At 0554 hrs [Plaintiff] is observed going to the top tier into cell 11. CO
> Z. Cox returns to remove the tray from the section, [Plaintiff] returns to his trays
> and does not attempt to eat the tray. At 0556hrs, CO Z. Cox attempts to take the
> tray out of the section, [Plaintiff] forces it out of CO Z. Cox's hands. CO Z. Cox
> attempts to get the tray again, at that time [Plaintiff] hits CO Z. Cox in the facial
> region with the tray. A struggle begins and CO Z. Cox falls to the ground. [Plaintiff]
> gets on his back and begins striking CO Cox in the head. CO Z. Cox's watch comes
> off and lands in front of cell 16. Inmate [Bruce Hargis] is seen picking up the watch
> and placing it on his wrist. At 0557 hrs, officers arrive in the section and [Plaintiff]
> attempts to run away from them and falls in front of cell 4. Inmate Broyles is seen
> attempting to grab CO Z. Cox from behind. Cpl. Hood deploys OC [spray]. At 0558
> hrs, [Plaintiff] is removed from the section. C-1 was locked down due to the
> incident and refusing to lockdown when order to do so. Inmate Hargis was in cell
> 13. I entered the cell and asked him what he did with the watch. He denied having
> the watch. His cell was searched and the watch was not found. [Plaintiff's] property

7

was in cell 11. The cell was searched. All legal mail and commissary were placed in his personal property in Booking. [Plaintiff] will be charged with 1.02 Assault and/or Battery, and 1.16 Obstructing. Inmate [Bruce Hargis] will be charged with 1.15 Destruction of Property/1.21 Theft of Property Valued over $100.00. Inmate [James Broyles] will be charged with 1.02 Assault and/or Battery/1.16 Obstructing. Inmate [Nicholas Johnson] will be charged with 1.12 Demonstration/1.16 Obstructing.

(Id.)

On the same day of the incident, Defendant Hood prepared an Incident Report detailing the events that occurred on January 27, 2020 at approximately 6:00 a.m. (Document No. 40-2.) Specifically, Defendant Hood described the incident as follows:

On Monday, January 27th, [2020], I Cpl. Dakota Hood was working my assigned post as Booking Officer. At around 0600 hrs, C-Tower Operator Daniel Shipp called Officer Assistance to C-1. I responded along with Lt. Nicholas Burton, SGT. Benjamin Houchins, CO Tyler Pauley, CO Austin Bowyer, and multiple other officers. Upon arriving to the section, I witnessed [Plaintiff] on top of CO Zachary Cox punching him in the face. [Plaintiff] then got off of CO Cox and ran across the dayroom falling in front of Cell 4. CO Pauley, CO Bowyer, and Lt. Nicholas Burton was securing [Plaintiff] on the ground and I began locking the section down with Sgt. Houchins. After shutting Cell 2, I seen Inmate [James Broyles] running across the dayroom and attempted to grab CO Cox. I then deployed a 1 second burst of OC [spray] to Inmate Broyles fascial area and he turns around and returns to his cell. The section as then locked down and [Plaintiff] is escorted out of the section and placed in an interview room until he can be cleared by a nurse. Once [Plaintiff] was cleared, he was then housed in A-1 and I returned to my assigned post.

(Id.)

On January 29, 2020, Defendant Bowyer prepared an Incident Report detailing the events that occurred on January 27, 2020 at approximately 6:00 a.m. (Document No. 40-4.) Specifically, Defendant Bowyer described the incident as follows:

On 27 January 2020 at approximately 0600 hours, I officer Austin Bowyer was performing my duties as B-Rover when Officer Daniel Shipp radioed for officer assistance in C-1. I ran to C-POD and upon entering C-1, I witnessed [Plaintiff] on top of Officer Zachary Cox. I then ran to the inmate and told everyone to lock down. [Plaintiff] then got up and ran to cell 4 and fell down. I then got on top of him and held his arms long with Officer Cox and Cpl Tyler Pauley. I then witnessed Cpl Dakota Hood spray an inmate beside me. Once we had [Plaintiff] handcuffed, we

escorted him out of the section and up to the interview room. Once placed in the room, I returned to my duties as B-Rover.

(Id.)

On the same day of the incident, Defendant Pauley prepared an Incident Report detailing

the events that occurred on January 27, 2020 at approximately 6:00 a.m. (Document No. 40-5.)

Specifically, Defendant Pauley described the incident as follows:

> I COII Tyler Pauley on the date above was working my assigned post in booking when at approx. 0600 hours officer assistance was called by CO Ryan Ship in C1. Myself and Cpl. Dakota Hood responded from booking. Once we arrived, we entered the section where [Plaintiff] was standing overtop of CO Zachary Cox punching him in the face. [Plaintiff] then tried to run from officers Hood and CO Austin Bowyer. I then went after [Plaintiff] and attempted to take down [Plaintiff]. [Plaintiff] then ducked to avoid me. Officers then restrained [Plaintiff] on the ground. I then placed [Plaintiff] in mechanical restraints. [Plaintiff] was then escorted up the hall and placed in an interview room until a nurse was available to clear him. I then went to medical to check on CO Z. Cox. Officer Cox had a large gash on his eyebrow. Once medical staff was finished with CO Z. Cox, myself and Cpl. Hood then escorted [Plaintiff] to medical. [Plaintiff] was cleared by nurse Cadace Hatfield. [Plaintiff] was escorted to A-1 cell 5 per Lt. Nicholas Burton. I then returned to my assigned post in booking.

(Id.)

On the same day of the incident, Defendant Walters prepared an Incident Report detailing

the events that occurred on January 27, 2020 at approximately 6:00 a.m. (Document No. 40-6.)

Specifically, Defendant Walters described the incident as follows:

> On the above date and time Officers Assistance was called to C-1, I Officer Johnathan Walters responded. When I arrived Officers Austin Bowyer, Dakota Hood and Tyler Pauley had [Plaintiff] on the floor attempting to retrain him. I then assisted the officers by restraining [Plaintiff's] arm while Officer Pauley applied mechanical restraints to [Plaintiff]. I then went to medical to check on Officer Zack Cox who was assaulted by [Plaintiff]. Officer Cox had sustained a large gash to his facial area "forehead." Nurse Candace Hatfield was assisting Officer Cox with the gash. I then returned to my duties as Administrative Officer.

(Id.)

9

On the same day of the incident, Defendant Houchins prepared an Incident Report detailing the events that occurred on January 27, 2020 at approximately 6:00 a.m. (Document No. 40-7, pp. 1- 3.) Specifically, Defendant Houchins described the incident as follows:

> At 0600 hours, while I Sgt. Ben Houchins was serving trays in medical, responded to an officer assistance call in C-1. Upon entering C1 [Plaintiff] was restrained on the floor in front of cell 4 in C1 dayroom by several officers. I followed officers up the stairs to the top tier to lock down the section. The section was locked down. [Plaintiff] was escorted in handcuffs to an interview room. He was seen in medical by a nurse. Upon returning to medical I became aware that CO Zachary Cox had been injured during the altercation. I helped Cpl. Meador finish serving trays in medical. I then stayed with CO Cox during his treatment by the nurse. We then went to the front office where the secretary helped CO Cox fill out paperwork for the hospital. At 0700 hours I drove CO Cox to Beckley ARH Hospital to be seen at the Emergency Room. I stayed with CO Cox until approximately 0755 hours at which time his mother arrived. I then returned to the jail.

(Id.)

On February 7, 2020, Officer Sturgill prepared an Incident Report detailing the events that occurred on January 27, 2020 at approximately 5:56 a.m. (Id., pp. 4 – 5.) Specifically, Officer Sturgill described the incident as follows:

> One the above date, I CO Kimberly Sturgill was working my assigned post as A Rover. At approximately 0556 hours CO Daniel Shipp called officer assistance in C Pod Section 1. When I arrived CO Tyler Pauley, CO Zachary Cox, and CO Austin Bowyer had [Plaintiff] on the ground. I proceeded to help restrain [Plaintiff] on the ground. [Plaintiff] was then placed in mechanical restraints and escorted to an interview room to await being cleared by medical. Other responding officers were Lt. Nicholas Burton, CO Jonathan Walers, CO Matthew Whitt, Sgt. Benjamin Houchins, and Cpl. Dakota Hood.

(Id.)

On February 7, 2020, Officer Shipp prepared an Incident Report detailing the events that occurred on January 27, 2020 at approximately 6:00 a.m. (Id., pp. 6 – 7.) Specifically, Officer Shipp described the incident as follows:

> At 0600 while performing my duties at C-Tower, I heard raised voices from C-1. Upon looking into C-1, I saw CO Cox, Zachary telling [Plaintiff] to give up the two

trays in his possession. After multiple refusals to follow these verbal orders, CO Z. Cox grabbed the trays. [Plaintiff] pulled back the trays sending the contents to the floor and swung and hit CO Z. Cox in the head with the trays. I then called for officer assistance in C-1 while opening gate 8. I then looked back into C-1 to see [Plaintiff] on top of Office Z. Cox in any attempt to cause further harm. CO [Pauley] and CO Bowyer were first on the scene. After seeing the two officers, [Plaintiff] got to his feet and ran from the officers who took him to the ground soon after. Officer Jonathan Walters, Officer Tyler Pauley, Officer Kimberly Sturgill, Lt. Nicholas Burton and Cpl. Dakota Hood arrived on scene and locked down the section to secure the inmate and escorted [Plaintiff] out of the section.

(Id.)

On February 4, 2020, Defendant Cox prepared an Incident Report detailing the events that

occurred on January 27, 2020 at approximately 6:00 a.m. (Id., pp. 8 – 9.) Specifically, Defendant

Cox described the incident as follows:

On 27 January 2020 at 0600, I CO Zachary Cox was assaulted by [Plaintiff]. I just finished serving trays, last section being C3. I started my tray pickup in C5 then C4, then when I arrived in C1, trays were scattered in the section. So, I began picking them up and when I went to grab the ones on the table, [Plaintiff] went up and started taking the food off the trays. I waited a few seconds and told him to speed it up. He got slower. I told him again and still nothing. So, I attempted to grab them and was ultimately assaulted by a tray to the left side of my head. I was stunned and confused and when I reacted, I attempted to place [Plaintiff] on the ground. I was unaware of myself bleeding a lot and slipped on my own blood. [Plaintiff] got on top and I rolled over to protect my face while blood progresses to darken the concrete floor in crimson red. The last thing I remember is seeing Officer Austin Bowyer rush into the section. I was then taken to medical to be cleansed of the iron rich blood.

(Id.)

In his deposition, Plaintiff testified that, with the exception of the use of OC spray, he does

not allege that any officer used excessive force during the initial altercation through his remove

from Section C1 and placement in the interview room. (Document No. 40-8, pp. 9 – 10.) Plaintiff

claims that an unknown officer sprayed him on the side of the face and back of the head, while

Plaintiff was on the ground with his hands behind his back. (Id., pp. 8- 10.) Plaintiff states that he

believes this was excessive force because he was not resisting. (Id., pp. 11 – 12.) Plaintiff explains

11

that he is not asserting a claim of excessive force against any other defendant concerning the altercation that took place in C1. (<u>Id.</u>) Plaintiff further explains that he is only asserting excessive force against Defendant Burton as to events that occurred in the interview room. (<u>Id.</u>, p. 12.) Plaintiff acknowledges that his "excessive force claim is limited to whoever" sprayed him with OC spray in Section C1 and Lieutenant Burton based on events occurring in the interview room. (<u>Id.</u>, pp. 11 – 12.)

In his Declaration, Plaintiff states he "was sprayed with OC by an officer while [Plaintiff] was face down [and] handcuffed at the back." (Document No. 45.) Plaintiff asserts "[t]here were several officers around when I was sprayed, so I don't know exactly which one sprayed because I was face down with officers on my back." (<u>Id.</u>) Plaintiff states he was then taken to an interview room where he was "sprayed & assaulted by Lt. Burton" while "another CO" watched. (<u>Id.</u>) Plaintiff asserts that he was then taken to Section A1 "where CO Witt told several inmates to 'f*ck me up & they will get out early.'" (<u>Id.</u>) Plaintiff asserts that he was "assaulted by Emmanuel Jones in A-1, cell 5, then assaulted against by Inmate Dixon [in] A-1, cell 8." (<u>Id.</u>) Plaintiff states that Defendants Burton, Witt, Bowyer, Cox, Lilly, Cook, Warden, Dillon, Athy, Burrnett, and Francis "all knew about the assault and were asked by [Plaintiff] numerous of times, for more than 8 days, to be moved and more importantly asked to shower so I could get the OC & blood off of me." (<u>Id.</u>) Plaintiff acknowledges that after eight days, he was moved to Cell 6 but still not provided with a shower or change of clothes. (<u>Id.</u>) Plaintiff, however, states that Cell 6 had no water, there was "flooding" in the cell from the leaking window, and no mat from 5 a.m. to 11 p.m. (<u>Id.</u>) Plaintiff further asserts that Defendants Witt, Bowyer, Hood, and Houchins slid Plaintiff's flood tray under the cell door that was flooded with water and feces, which caused him not to eat for 4 or 5 days. (<u>Id.</u>) Plaintiff states that the asked Defendants Burton, Hood, Pauley, Houchins, Waters, Bowyer,

Cox, Whitt, Lilly, Warden, Dillion, Cook, Athy, Burrnett, and Francis for food and water, but "none of them helped me at all." (Id.) Plaintiff states that when he "felt [he] was going to die, [he] begun to drink the toilet water to stay hydrated." (Id.) Plaintiff asserts that "[n]ot once while [he] was in Cell 6 did [he] get a cup of water." (Id.) Plaintiff states that he was held in Cell 6 for "several days" then he was moved to Cell 12. (Id.) Plaintiff asserts that he was only allowed to shower "4 or 5 times in a 30 day span." (Id.)

In Inmate Hayden Dixon's Declaration, he states that he was housed in A-1, Cell 8 with Plaintiff on or about January 27, 2020. (Document No. 48.) Inmate Dixon states that Plaintiff was initially "placed in a cell upstairs." (Id.) Inmate Dixon explains that subsequently officers brought Plaintiff to his cell (Cell 8) and Inmate Dixon "told officers I'm not living with any other inmates." (Id.) Inmate Dixon states that Plaintiff also informed officers that "he didn't want to live with me either." (Id.) Inmate Dixon asserts that "officers said something like 'You both assaulted my officers, you're living together. I don't care if you kill each other.'" (Id.) Inmate Dixon states that Plaintiff then "told the COs he was scared for his life and didn't want to live in the cell with me, to put him in protective custody." (Id.) Inmate Dixon asserts that when Plaintiff entered his cell, Inmate Dixon "started coughing because of the OC spray that was on [Plaintiff's] clothes along with all the blood on his clothes." (Id.) Inmate Dixon states that Plaintiff made several requests for a change of clothes and a shower, but such was denied. (Id.) Inmate Dixon asserts that "[w]hile [Plaintiff] was my celly in A-1 8, he was not allowed to have a mat from 5 am – 11 pm" and he was never provided a shower or change of clothes. (Id.) Inmate Dixon states that their food trays were slid under the door and "[t]here was urine and feces from other inmates on the floor on the bottom of the door." (Id.) Inmate Dixon acknowledges that he and Plaintiff had "a few physical altercations while in the cell" and officers ignored Plaintiff's request for "protective custody." (Id.)

Inmate Dixon asserts that "days later," Plaintiff as moved to Cell 6, in Section A-1. (Id.) Inmate Dixon states that Plaintiff complained about "not having water" and the water on the floor, but officers took no action to "close the water seal that the water ran out of on the floor." (Id.) Inmate Dixon states Plaintiff "asked every CO that came in everyday for water & a shower, [but] they never done anything for me or him." (Id.)

## **STANDARD**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-moving movant." Wai Man Tom v. Hospitality Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020)(citations omitted.); also see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(A "material fact" is a fact that could affect the outcome of the case); CTB, Inc. v. Hog Slat, Inc., 954 F.3d 647, 658 *4th Cir. 2020)("A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict of the nonmoving party."); FDIC v. Cashion, 720 F.3d 169, 180 (4th Cir. 2013)(A "genuine issue" of material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor). "The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact." Wai Man Tom, 980 F.3d at 1037. The moving party may satisfy this burden by showing that the non-moving party has failed to prove an essential element of the non-moving party's case that the non-moving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986)(Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim.). Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. See Celotex Corp., 477 U.S. at 325, 106 S.Ct. 2548; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986); also see Wai Man Tom, 980 F.3d at 1037(citation omitted)("[T]o survive the motion for summary judgment, [the non-moving party] may not rest on the allegations averred in his pleadings. Rather, the nonmoving party must demonstrate specific, material facts exist that give rise to a genuine issue.") Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson, 477 U.S. at 247-48, 106 S.Ct. 2505("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); Perry v. Kappos, 2012 WL 2130908, * 3 (4th Cir. 2012)(quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)("At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action.") All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356; also see Sedar v. Reston Town Center Property, LLC, 988 F.3d 756, 763 (4th Cir. 2021)("The requirement to construe the facts, and all reasonable inferences therefrom, in the light most favorable to the non-moving party does not require [the court] to accept cherry-picked snippets of the testimony divorced from their context."). Additionally, the court is not allowed to make credibility determinations or weigh the evidence at

the summary judgment stage. <u>Stanton v. Elliott</u>, 25 F.4th 227, 234 (4th Cir. 2022)(noting that the disbelief in a non-moving party's ability to succeed on the merits is insufficient to grant summary judgment). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate. <u>See</u> <u>Moss v. Parks Corp.</u>, 985 F.2d 736, 738 (4th Cir. 1993)(Summary judgment is proper where it is apparent from the record that "no reasonable jury could find for the nonmoving party.")

## ANALYSIS

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." <u>Turner v. Safley</u>, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Title 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." Thus, Section 1983 provides a "broad remedy for violations of federally protected civil rights." <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658, 685, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Generally speaking, to state and prevail upon a claim under 42 U.S.C. § 1983, a Plaintiff must prove that (1) a person acting under color of State law (2) committed an act which deprived him of an alleged right, privilege or immunity protected by the Constitution or laws of the United States.

1.      **Excessive Force:**

In his Complaint, Plaintiff alleges that he was subjected to excessive force after he got into a fight with a correctional officer on January 27, 2020. (Document No. 2.) In support, Plaintiff states that Defendants Burton, Hood, Pauley, Houchins, Walters, Bowyer, and Cox took him "to the ground and sprayed" him with pepper spray. (<u>Id.</u>, p. 4.) Plaintiff alleges he was then taken to an interview room where Officer Burton verbally threaten Plaintiff. (<u>Id.</u>)

In their Motion for Summary Judgment, Defendants first argue that Plaintiff's claim of

excessive force should be dismissed "as to all Defendants because Plaintiff acknowledges that all forced used in C-1 was necessary and appropriate, and in response to Plaintiff's attack on Defendant Cox." (Document No. 40 and Document No. 41, pp. 7 – 12.) In support, Defendants contend that "Plaintiff testified that the force used in C-1 was not excessive, with the possible exception of the use of OC spray on him." (Document No. 41, p. 8.) Defendants asserted that video evidence and incident reports establish that Plaintiff as not directly sprayed with OC spray. (Id.) Defendants acknowledge that it is possible that Plaintiff came into contact with overspray from OC spray used on other inmates, but the video evidence shows that no OC spray was used by any officer directly against Plaintiff. (Id.) Defendants contend the use of OC spray against other inmates was "reasonable and necessary to 'preserve internal order and discipline and to maintain institutional security.'" (Id., p. 9.) To the extent Plaintiff is asserting a claim of excessive force against Defendant Burton based on allege events occurring in the interview room, Defendants argues that Plaintiff has failed to develop any evidence of any force used by Defendant Burton and threats of violence are insufficient. (Id., pp. 7 and 10.) Defendants conclude they are entitled to summary judgment because the "force utilized by the Defendants was not excessive and did not violate Plaintiff's rights." (Id., p. 12.)

In Response, Plaintiff states that his "claims drastically differ from those" set forth by Defendants. (Document No. 44, p. 2.) Plaintiff notes that he is claiming that he was sprayed with OC spray "after being handcuffed behind his back and [he] was not resisting the officers in any way." (Id.) Plaintiff further states that he was "then taken to an interview room where he was beaten by officials and pepper sprayed again out of view of cameras." (Id.) Plaintiff claims the "video of the altercation in the pod . . . is not clear, although several officers can be seen clearly pointing cans of OC spray towards [Plaintiff] directly." (Id.) Plaintiff points out that he "has stated

17

under penalties of perjury that he was sprayed with pepper spray (OC) while handcuffed behind his back, then afterwards was ordered a shower and clothes by the nurse, and the officers refused the allow him to do so." (Id., pp. 2 – 3.) Plaintiff alleges that the foregoing "caused him several days of extreme burning pain." (Id., p. 3.) Plaintiff states that the following officers were directly responsible for the excessive force: Burton, Hood, Pauley, Houchins, Walter, and an unknown CO. (Id.) Plaintiff concludes that Defendants are not entitled to summary judgment because he has declared under the penalty of perjury that he was sprayed with OC spray and the video recording the altercation is unclear. (Id.) As an Exhibits, Plaintiff attaches the following: (1) A copy of a screen shot of the video time stamped 5:57:12 wherein Plaintiff claims an officer can be seen pointing OC spray in Plaintiff's direction. (Document No. 44-1.); and (2) Plaintiff's Declaration (Document No. 45.)

In Reply, Defendants first note that "[u]nderstanding that his criminal assault on Defendant Cox required the Defendants to use force, Plaintiff limits his excessive force claim related to C-1 to his allegation that an unidentified officer used OC spray on him while restrained on the ground." (Document No. 46, p. 2.) Defendants argue that "video evidence clearly show that no officer used OC on Plaintiff, and that force used to restrain Plaintiff was minimal." (Id.) Defendants acknowledge that two officers (Defendants Burton and Hood) used OC spray in C-1, but these officers used the OC spray in an attempt to control other inmates. (Id.) Defendants continue to argue that the recorded video shows that no officer used OC directly toward Plaintiff. (Id.) Defendants conclude that "Plaintiff's excessive force claim related to actions taken in C-1 must be dismissed, and judgment granted to Defendants as no factual basis exists to support a section 1983 claim." (Id., p. 3.) As to Plaintiff's claims concerning the interview room, Defendants note that Plaintiff's Complaint does not allege any use of force by Defendant Burton or any other Defendant

18

in the interview room. (Id.) Defendants note that Plaintiff only alleges that Defendant Burton threatened him, and threats are insufficient to support a claim under Section 1983. (Id., pp. 3 – 4.) Defendants further note that the video and screen shots of the surveillance video "show Plaintiff without any type of mark, bruise, or other visible injury, and generally showing no signs of distress from the alleged "beating" from multiple officers, or exposure to OC." (Id., p. 4.) Defendants note that the only evidence that officers used any type of force against Plaintiff after he was restrained is Plaintiff's self-serving testimony/declaration. (Id.) Defendants argue that Plaintiff's self-serving testimony without objective corroboration is insufficient to defeat summary judgment. (Id., pp. 4 – 5.) Defendants state that "Plaintiff's account is directly contradicted by the incident reports of the officers, and surveillance video." (Id., p. 5.) Thus, Defendants argue they are entitled to summary judgment concerning Plaintiff's excessive force claim. (Id.)

As a general matter, punishments prohibited under the Eighth Amendment include those which "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In the context of prison officials' use of force upon an inmate, the appropriate inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986)(citations

19

omitted); also see Wilkins v. Gaddy, 559 U.S. 34, 130 S.Ct. 1175, 178, 175 L.Ed.2d 995 (2010). To establish a violation of the Eighth Amendment in the context of a challenge to prison officials' use of force, an inmate must allege (1) that the prison officials acted with a "sufficiently culpable state of mind" under a subjective standard and (2) a "sufficiently serious" injury under an objective standard. Wilson v. Seiter, 501 U.S. 294, 297-99, 111 S.Ct. 2321, 2323-25, 115 L.Ed.2d 271 (1991); also see Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008).

To establish the subjective component, an inmate must demonstrate that prison officials applied force "maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21, 106 S.Ct. at 1085. In determining whether prison officials acted maliciously and sadistically, the following factors must be balanced: (1) "the need for application of force," (2) "the relationship between that need and the amount of force used," (3) "the threat reasonably perceived by the responsible officials," and (4) "any efforts made to temper the severity of a forceful response." Iko, 535 F.3d at 239(citing Whitley, 475 U.S. at 321, 106 S.Ct. at 1078). Additionally, the absence of serious injury is relevant to the determination of prison officials' culpable intent, but is not dispositive. Id. Although every "malevolent touch" by a prison guard will not give rise to a federal cause of action, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." See Wilkins, 559 U.S. at 38, 130 S.Ct. at 1179; Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992).

Concerning the objective component, the focus is "not on the severity of any injuries inflicted, but rather on 'the nature of the force,' which must be 'nontrivial.'" Wilkins, 559 U.S. at 40, 130 S.Ct. at 1179("The 'core judicial inquiry' . . . [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore

discipline, or maliciously and sadistically to cause harm.'"); <u>also see</u> <u>Hill v. Crum</u>, 727 F.3d 312, 321 (4th Cir. 2013)("[T]he nature of the force, rather than the extent of the injury, is the relevant inquiry.") The "absence of serious injury," however, is not irrelevant to the inquiry. <u>Id.</u>, 559 U.S. at 37, 130 S.Ct. at 1178(citing <u>Hudson</u>, 503 U.S. at 9, 112 S.Ct. at 995). The extent of an inmate's injury may (1) "suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation," and (2) "provide some indication of the amount of force applied." <u>Id.</u>(citations omitted). 'The Eighth Amendment's prohibition . . . necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of the sort repugnant to the conscience of mankind." <u>Harris v. Salley</u>, 339 Fed.Appx. 281, 284 (4th Cir. 2009), <u>citing</u> <u>Hudson</u>, 503 U.S. at 9 - 10, 112 S.Ct. at 1000. "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." <u>Wilkins</u>, 559 U.S. at 38, 130 S.Ct. at 1178(citations omitted). The objective component standard, however, is significantly less demanding than required in the context of challenges to conditions of confinement because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." <u>Hudson</u>, 503 U.S. at 9, 112 S.Ct. at 1000 ("This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.") Thus, the objective component is "responsive to contemporary standards of decency." <u>Id.</u>

**A.    Claims based on events occurring in Pod C-1:**

First, the undersigned will consider Plaintiff's claim that he was subjected to excessive force when he was sprayed with OC spray after was restrained on the floor with handcuffs. As discussed above in the "Summary of Evidence," there is no evidence other than Plaintiff's self-

serving Declaration that Plaintiff was directly sprayed with OC spray. A review of Incident Reports prepared by the officers involved in the incident and the surveillance video reveals that Plaintiff was not directly sprayed with OC spray. Importantly, the description of the events surrounding the incident as set forth in the Incident Reports are collaborated by the surveillance video evidence. A review of the surveillance video reveals that after ceasing his attack of Defendant Cox, Plaintiff ran from responding officers and fell to the floor at time stamp 5:57:12. After Plaintiff fell to the floor, Defendants Cox and Bowyer are knelled on the floor beside Plaintiff attempting to restrain Plaintiff and Defendant Pauley is securing an inmate in a nearby cell (Cell 6). At time stamp 5:57:16, Defendant Burton enters C-1. At time stamp 5:57:17, Inmate Broyles begins aggressively approaching Defendants Cox and Bowyer from behind getting in very close proximity to Defendant Cox. At time stamp 5:57:20, Defendant Hood deploys a burst of OC spray towards Inmate Broyles. At this time, Inmate Broyles retreats and began complying with officers' orders to lockdown. At time stamp 5:57:21, Defendant Burton removes his OC spray from his side and points the OC spray towards the top of the steps in the opposite direction of Plaintiff's location. At time stamp 5:57:24 -33, inmates at the top of the stairs begin to comply with lockdown orders and Defendant Burton walks towards Cells 8 pointing the OC spray towards an inmate that has not locked down and then towards inmates on the top tier immediately above Plaintiff's location. At time stamp 5:57:27, Defendant Pauley joins Defendants Cox and Bowyer in their restraint of Plaintiff. At time stamp 5:57:30-36, Defendant Pauley is seen attempting to place handcuffs on Plaintiff. At time stamp 5:57:38-41, Plaintiff is seen putting his left arm behind his back as Officer Sturgill and Defendant Walters join Defendants Cox, Bowyer, and Pauley in their restraint of Plaintiff. At time stamp 5:58:00-13, officers depart from around Plaintiff and Plaintiff is helped to his feet due to his hands being restrained behind his back. At time stamp 5:58:24, Plaintiff exits

22

C-1. At time stamp 5:58:36-47, Plaintiff is seen proceeding down the hallway without any indication of distress on the surveillance video entitled "Gate 8 Inside." At time stamp 5:59:29-41, Plaintiff proceeds down the "Medical to Central" hallway with no signs of distress. Specially, Plaintiff appears to have both eyes open looking to his left and right as he proceeds down the hallway. At time stamp 6:32:02, Plaintiff is taken down the hallway to Medical without any indication of distress.

A close review of the surveillance video reveals that all officers that assisted with the restraining and handcuffing of Plaintiff, entered C-1 empty handed. None of these officers are seen removing the OC spray from their side during the restraint/handcuffing, and none of the officers are seen with OC spray in their hands during the restraint/handcuffing or immediately thereafter. Although Plaintiff references a screen shot of the surveillance video time stamped 5:57:12 to support his claim that an officer (Officer Pauley) is pointing OC spray in Plaintiff's direction, such is refuted by a review of the surveillance video. See Anderson, 477 U.S. at 247-48, 106 S.Ct. 2505("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); Perry v. Kappos, 2012 WL 2130908, * 3 (4th Cir. 2012)(quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)("At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action.") A review of the surveillance video clearly shows Officer Pauley entering C-1 empty handed, and Officer Pauley immediately runs head-on towards Plaintiff as Plaintiff is running from other officers. At time stamp 5:57:11, Officer Pauley lunges toward Plaintiff in an attempt to block Plaintiff's path and Plaintiff falls or dives to the floor to avoid Officer Pauley's block. Time stamp 5:57:12 shows Officer Pauley turning back towards Plaintiff with open and empty hands after he

missed the blocking of Plaintiff's path.

Viewing the evidence most favorable to Plaintiff, the undersigned finds no evidence that Defendants used excessive force against Plaintiff during the altercation in C-1. At most, the evidence indicates that Plaintiff may have been hit with OC overspray when Defendant Hood deployed OC spray against Inmate Broyles. The surveillance video clearly reveals that Inmate Broyles was aggressively approaching Defendants Cox and Hood from behind in an effort to obstruct the officers' restraint of Plaintiff. Besides Plaintiff's self-serving Declaration (Document No. 45), the record is void of any indication that any Defendant directly sprayed Plaintiff with OC spray during the incident that took place in C-1. Plaintiff's self-serving declaration contrary to the objective evidence is not sufficient to preclude summary judgment. See Harris v. Home Sales Co., 499 Fed.Appx. 285, 294 (4th Cir. 2012)("Although we do not make credibility determinations at the summary judgment phase, we should also not find a genuine dispute of material fact based solely on [plaintiff's] self-serving testimony.") Even where the non-moving party in such a situation is a *pro se* prisoner entitled to liberal construction of his pleadings, a "declaration under oath ... is not enough to defeat a motion for summary judgment. He has to provide a basis for his statement. To hold otherwise would render motions for summary judgment a nullity." Campbell–El v. Dist. of Columbia, 874 F.Supp. 403, 406–07 (D.C.1994); also see Evans v. Technologies Applications & Service, Co., 80 F.3d 954, 692 (4th Cir. 1996)(Summary judgment affidavits cannot be conclusory or based on hearsay; Moore v. United States, 1987 WL 11280 (S.D.W.Va. March 23, 1987)(Unsupported affidavits setting forth "ultimate or conclusory facts and conclusions of law" are insufficient to either support or defeat a motion for summary judgment.); Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002)(citing Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.2001))(Courts are not required "to accept as true allegations that are merely conclusory, unwarranted deductions

of fact, or unreasonable inferences."). The record clearly reveals that Defendant Hood's burst of OC spray was directed at Inmate Broyles in efforts to control his aggressive behavior and failure to comply with orders to lockdown. There is no indication that a quantity of OC spray greater than necessary was used. See Iko, 535 F.3d at 240(citation omitted)("[I]t is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain.") Defendant Hood did not deploy any additional bursts of OC spray after Inmate Broyles turned away from Officers Cox and Bowyer. See Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996)(the use of OC spray is permissible when used to control a recalcitrant inmate). The record is completely void of any indication that Defendants applied force "maliciously and sadistically for the very purpose of causing harm" during the altercation in C-1. Accordingly, the undersigned respectfully recommends that the District Court grant Defendants' Motion for Summary Judgment as his excessive force claim based on events occurring in C-1.

**B.     Claims based on events occurring in the interview room:**

Next, the undersigned will consider Plaintiff's claim of excessive force based on events occurring in the interview room. In his Complaint, Plaintiff alleges he was then taken to an interview room where Defendant Burton threaten Plaintiff. (Document No. 2.) Specifically, Plaintiff alleges that Defendant Burton stated as follows:

> Give me one good reason I shouldn't jump over this table and f\*\*k you up badly this time. If it weren't Monday morning with courts and all the important people here, I'd take you in medical were there are no cameras, and we would kill your fat ass. You know that don't you? Draw blood on my officer, we kill you.

(Id.) In Defendants' Motion for Summary Judgment, Defendants argue that Defendant Burtons' alleged threats of violence are insufficient to state a claim. (Document Nos. 40 and 41.) In his

Response in Opposition and Declaration in Support, Plaintiff asserts for the first time that he was sprayed with OC spray and beaten while detained in the interview room. (Document Nos. 44 and 45.) Specifically, Plaintiff states in his Declaration that he was then taken to an interview room where he was "sprayed & assaulted by Lt. Burton" while "another CO" watched. (Document No. 45.) In his Response in Opposition, Plaintiff states that he was "then taken to an interview room where he was beaten by officials and pepper sprayed again out of view of cameras." (Document No. 44, p. 2.) Plaintiff does not dispute that Defendant Burton's verbal threats failed to constitute a constitutional violation. (See Document No. 44.)

First, the undersigned finds it procedurally improper to consider Plaintiff's new claim that he was beaten and sprayed with OC spray while detained in the interview room. It is well established that it is procedurally improper for a litigant to assert a new claim in a brief submitted in opposition to a motion for summary judgment. See Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262, Fed.Appx. 556, 564 (4th Cir. 2008)(citing Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)."); also see Bridgeport Music, Inc. v. WM Music Corp., 508 F.3d 394, 400 (6th Cir. 2007)(a party may not expand its claims in response to summary judgment); Weldon v. Nohe, 2016 WL 7042931, at *3 (S.D.W. Va. Dec. 2, 2016), aff'd, 684 Fed. Appx. 275 (4th Cir. 2017)(when a litigant raises new claims in a responsive pleading to a motion to dismiss, those claims should not be considered absent a motion to amend.); McCoy v. Southern Energy Homes, Inc., 2012 WL 1409533 (S.D.W.Va. April 23, 2012)(J. Faber)(citations omitted)("A plaintiff cannot rely on a response to a motion for summary judgment to act as an amendment to correct deficiencies in a complaint challenged by defendant's motion for summary judgment."); White v. Roche Biomed.

Labs, Inc., 807 F.Supp. 1212, 1216 (D.S.C. 1992)("a party is generally not permitted to raise a new claim in response to a motion for summary judgment"); United States v. Jones, 1988 WL 21257, * 1 (D.S.C. March 9, 1988)(finding no err in the court's failure to "consider a new claim raised by [plaintiff] in pleading . . . which was filed in response" to a motion for summary judgment). Plaintiff has clearly asserted new claims in his Declaration and Response filed in opposition of Defendants' Motion for Summary Judgment. Plaintiff has not filed a motion to amend to include these claims. Accordingly, the undersigned finds it procedurally improper to consider the above claims.

Concerning Plaintiff's claim that Defendant Burton violated his constitutional rights by subjecting Plaintiff to verbal abuse or threats, such a claim fails to state a cognizable claim. The undersigned views Plaintiff's Complaint as attempting to set forth a claim under the Eighth Amendment. Plaintiff contends that Defendant Burton violated his Eighth Amendment rights by subjecting him to verbal abuse and threats. There is no factual allegation in Plaintiff's Complaint that Defendant Burton made any type of physical contact with Plaintiff when making these alleged threats. At most, Plaintiff is alleging that Defendant Burton subjected him to verbal abuse or verbal threats. The verbal abuse or threats of an inmate by prison guards, without more, is insufficient to state a constitutional deprivation. Ivey v. Wilson, 832 F.2d 950, 954-55 (6th Cir. 1987); also see Lindsey v. O'Connor, 2009 WL 1316087, at * 1 (3rd Cir. (Pa.))(holding that "[v]erbal harassment of a prisoner, although distasteful, does not violate the Eighth Amendment"); Purcell v. Coughlin, 790 F.2d 263, 265 (2nd Cir. 1986)(stating that name-calling does not rise to the level of a constitutional violation); Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979)(finding that a sheriff's threats to hang a prisoner were insufficient to state a constitutional deprivation). Although this Court does not condone the alleged conduct by the Defendant Burton, the undersigned finds

that such fails to state a cognizable claim. Based on the foregoing, the undersigned finds that Plaintiff has failed to state a cognizable claim under the Eighth Amendment based upon Defendant Burton's alleged use of verbal threats during Plaintiff's detention in the interview room.

**2.     Unconstitutional Conditions of Confinement Claim:**

In his Complaint, Plaintiff alleges that Defendants subjected him to unconstitutional conditions of confinement during his placement in Section A-1. (Document No. 2.) First, Plaintiff complains that he was denied a shower after his exposure to the OC spray. (Id.) Plaintiff alleges that "it wasn't until weeks later" that he was provided a shower and change of clothes. (Id.) Plaintiff alleges that while confined in Section A-1 his food trays were slid under the cell door causing his food to be contaminated with human waste. (Id.) Plaintiff further complains that he was placed in Cell 6 where he was exposed to freezing temperatures, a flooded floor, and no access to running water. (Id.) Plaintiff explained that the window didn't have a seal, which is where the "water came from." (Id.) Plaintiff claims that he complained to officers, but no action was taken. (Id.) Plaintiff alleges that he was held in this cell for 24 hours a day, for numerous days, without working water to drink or wash his body. (Id., p. 9.) Plaintiff contends that "it wasn't until weeks later that I was able to finally shower, get clothes, and a cell with working water to drink." (Id.) Plaintiff alleges that Warden Francis and Capt. Athy walked through A-1 every week, and Plaintiff informed them of the foregoing. (Id.) Plaintiff again contends that no action was taken. (Id.)

In their Motion for Summary Judgment, Defendants argue that the "living conditions cited by Plaintiff do not rise to the level of extreme deprivations necessary to prove an 8th Amendment violation." (Document No. 40 and Document No. 41, pp. 12 – 14.) Defendants note that Plaintiff complains that "his food was contaminated by officers sliding his try under the cell door, that he was not permitted a sleeping mat during the day (mat was provided from 11:00 p.m. to 6:00 a.m.),

that the temperature in his cell was freezing, and that for a period of time his cell did not have running water." (Document No. 41, p. 12.) Defendants first note that the above claims are disputed. (Id.) Second, Defendants argue that the above claims "fail to state a claim because the record evidence does not include any information regarding the identity of any jail employee alleged to have caused or had actual knowledge of the above conditions." (Id.) Next, Defendants argue that "the evidence does not prove that these claimed conditions, if they existed, caused Plaintiff 'serious or significant physical or emotional injury." (Id., pp. 12 – 13.) Defendants, therefore, argue that Plaintiff's unconstitutional conditions of confinement claim should be dismissed because "Plaintiff's Complaint fails to allege living conditions at the Southern Regional Jail that rise to the level of extreme deprivations that proximately caused serious or significant physical or emotional injury." (Id.) Finally, Defendants argue that Plaintiff has failed to establish that any Defendant was deliberately indifferent to a substantial risk of serious harm to Plaintiff from the conditions of his confinement. (Id., pp. 14 – 15.)

In Response, Plaintiff argues that his claim that he "went hungry for numerous days" due to his food being contaminated with human waste and "was forced to drink the water out of the toilet in the cell to overcome the dehydration . . . most certainly rise to the level of extreme deprivation of basic human needs protected by the 8th Amendment." (Document No. 44, p. 4.) Plaintiff continues to complain that he was forced to sleep laying on a mat in a "freezing cold cell" that was flooded with water, feces, and urine. (Id.) Plaintiff further states that he was denied cleaning supplies and a shower. (Id.) Plaintiff states that he suffered hunger, dehydration, and burning from OC spray. (Id.) Plaintiff states that he verbally made all Defendants aware of the above conditions and all refused to take action to make the conditions humane and tolerable. (Id.) As Exhibits, Plaintiff filed the following: (1) Plaintiff's Declaration (Document No. 45); and (2)

29

The Declaration of Inmate Dixon (Document No. 48).

In Plaintiff's Declaration, Plaintiff states that after eight days in Section A-1, he was moved to Cell 6 in Section A-1 without being provided a shower. (Document No. 45.) Plaintiff states that Defendants Burton, Witt, Bowyer, Cox, Lilly, Cook, Warden, Dillon, Athy, Burrnett, and Francis knew Plaintiff had been denied a shower and "were asked by [Plaintiff] numerous of times, for more than 8 days, to be moved and more importantly asked to shower so I could get the OC & blood off of me." (Id.) Plaintiff asserts that Cell 6 had no water, there was "flooding" in the cell from the leaking window, and no mat from 5 a.m. to 11 p.m. (Id.) Plaintiff further states that Defendants Witt, Bowyer, Hood, and Houchins slid Plaintiff's flood tray under the cell door that was flooded with water and feces, which caused him not to eat for 4 or 5 days. (Id.) Plaintiff asserts that when he "felt [he] was going to die, [he] begun to drink the toilet water to stay hydrated." (Id.) Plaintiff asserts that "[n]ot once while [he] was in Cell 6 did [he] get a cup of water." (Id.) Plaintiff states that the asked Defendants Burton, Hood, Pauley, Houchins, Walters, Bowyer, Cox, Witt, Lilly, Warden, Dillon, Cook, Athy, Burrnett and Francis to "help" him, but all refused. (Id.) Plaintiff states that he was held in Cell 6 for "several days" then he was moved to Cell 12. (Id.) Plaintiff asserts that he was only allowed to shower "4 or 5 times in a 30 day span." (Id.)

In Inmate Dixon's Declaration, Inmate Dixon states that he "started coughing [when Plaintiff's entered his cell] because of the OC spray that was on [Plaintiff's] clothes along with all the blood on his clothes." (Document No. 48.) Inmate Dixon states that Plaintiff made several requests for a change of clothes and a shower, but was denied. (Id.) Inmate Dixon asserts that "[w]hile [Plaintiff] was my celly in A-1 [Cell] 8, he was not allowed to have a mat from 5 am – 11 pm" and he was never provide a shower or change of clothes. (Id.) Inmate Dixon states that their food trays were slid under the door and "[t]here was urine and feces from other inmates on

the floor on the bottom of the door." (Id.) Inmate Dixon asserts that after a few days, Plaintiff was moved to Cell 6 in Section A-1. (Id.) Inmate Dixon states that Plaintiff complained about "not having water" and the water on the floor, but officers took no action to "close the water seal that the water ran out of on the floor." (Id.) Inmate Dixon states Plaintiff "asked every CO that came in everyday for water & a shower, [but] they never done anything for me or him." (Id.)

The undersigned views Plaintiff's Complaint as setting forth a claim under the Eighth Amendment. As stated above, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety" under the Eighth Amendment. Wolfish, supra, 573 F.2d at 125. Thus, sentenced prisoners are entitled to reasonable protection from harm at the hands of fellow inmates and prison officials under the Eighth Amendment. See Farmer, 511 U.S. at 832-34, 114 S.Ct. at 1976-77; Trop v. Dulles, 356 U.S. 86, 102, 78 S.Ct. 590, 598-99, 2 L.Ed.2d 630 (1958); Woodhous v. Commonwealth of Virginia, 487 F.2d 889, 890 (4th Cir. 1973). Inmates' claims that prison officials disregarded specific known risks to their health or safety are analyzed under the deliberate indifference standard of the Eighth Amendment. See Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987); Moore v. Winebrenner, 927 F.2d 1312, 1316 (4th Cir. 1991) cert. denied, 502 U.S. 828, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991)(Stating that supervisory liability may be imposed where prison supervisors "obdurately," "wantonly," or "with deliberate indifference" fail to address a known pervasive risk of harm to an inmate's health or safety). To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991); also see King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016)(quoting

31

Strickler v. Waters, 989 F.2d 1375, 1379 (4ᵗʰ Cir. 1993))("[T]o make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.'"); Iko v. Shreve, 535 F.3d 225, 239 (4th Cir. 2008)(explaining that the above requirements "spring from the text of the amendment itself; absent intentionality, a condition imposed upon an inmate cannot properly be called 'punishment,' and absent severity, a punishment cannot be called 'cruel and unusual.'") To satisfy the objective component, Plaintiff must show that the challenged condition caused or constituted an extreme deprivation. De'Lonta v. Angelone, 330 F.3d 630, 634 (4ᵗʰ Cir. 2003). To demonstrate an "extreme deprivation," a plaintiff "must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from [his] exposure to the challenged conditions." Odom v. South Caroline Dept. of Corrections, 349 F.3d 765, 770 (4ᵗʰ Cir. 2003); also see Wilson v. Seiter, 501 U.S. at 298, 111 S.Ct. at 2321(A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities."); White v. Gregory, 1 F.3d 267, 269 (4ᵗʰ Cir. 1991)("In *Strickler*, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") To satisfy the subjective component, Plaintiff must demonstrate a "deliberate indifference" to his health and safety by defendants. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837, 114 S.Ct. at 1979. The Fourth Circuit has acknowledged that the "actual knowledge standard required to find

prison officials deliberately indifferent to a substantial risk of serious injury may be proven by circumstantial evidence." Makdessi v. Fields, 789 F.3d 126, 137-38 (4th Cir. 2015)(stating that "even under the subjective standard, a prison official cannot hide behind an excuse that he was unaware of a risk, no matter how obvious"); also see Porter v. Clarkes, 923 F.3d 348, 361 (4th Cir. 2019)("an obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate"). Plaintiff in this case must therefore allege and establish that each Defendant was aware of the excessive risk to Plaintiff's health or safety and each Defendant disregarded that risk.

### A.   General Denial of a Shower and Sleeping Mat for 30-days:

To the extent Plaintiff complains he was only allowed to shower "4 or 5 times" and denied a mat from 5 a.m. until 11 p.m. during an approximate 30-day period, the foregoing does not rise to the level of an Eighth Amendment violation. See Beverati, 120 F.3d at 504-05, n. 5(finding a six-month deprivation of clean clothing, linen, or bedding did not violate the Eighth Amendment); Murry v. Edwards County Sheriff's Dep't., 248 Fed.Appx. 993, 998 - 99 (10th Cir. Oct. 1, 2007)(finding that occasional disturbance of sleep by continual lighting, leading sometimes to mild physical symptoms, was not sufficiently serious to result in an Eighth Amendment violation); Hadley v. Peters, 70 F.3d 117 (7th Cir. 1995), cert. denied, 517 U.S. 1111, 116 S.Ct. 1333, 134 L.Ed.2d 484 (1996)("Prisons are not required to provide, and prisoner cannot expect, the services of a good hotel."); McCray v. Burrell, 516 F.2d 347, 367-69 (4th Cir. 1975)(finding an Eighth Amendment violation where an inmate was solitarily confined for 46 hours in a cold cell with no clothing or blankets, no running water or personal hygiene items, and a toilet which consisted of a hole in the floor); Ash v. Greenwood, 2018 WL 4201398, * 6 (S.D.W.Va. Aug. 30, 2018)(J. Goodwin)("[T]he temporary deprivation of a mattress, bedding, clothing, or hygiene products,

without a showing of an actual physical injury resulting therefrom, does not rise to the level of an Eighth Amendment violation."); Johnson v. Fields, 2017 WL 5505991, * 10 (W.D.N.C. Nov. 16, 2017)("Plaintiff's claim that he was denied a shower and clean clothes for twelve days is insufficient as a matter of law to maintain an Eighth Amendment claim."); Wagner v. Warden, 2015 WL 1276749, * 41 (D.Md. March 19, 2015)(dismissing Eighth Amendment claim where inmate alleged he was placed for two days in a cold cell without a mattress, toiletries, or running water, and with feces and urine on the floor because "the time he was allegedly placed in these conditions as brief"); Walker v. Dart, 2010 WL 669448, * 4 (N.D.Ill. Feb. 19, 2010)("Being denied clean clothes for two weeks, though unpleasant, is not a deprivation serious enough to support an Eighth Amendment claim)(collecting cases); DeLoach v. South Carolina Dept. of Corr., 2009 WL 1651452, * 3 – 4 (D.S.C. June 11, 2009), aff'd., 355 Fed.Appx. 681 (4th Cir. 2009)(denial of a clean jumpsuit and hygiene packet for a thirty day period did not constitute a denial of a 'basic need'); Ajaj v. United States, 479 F.Supp.2d 501, 547-48 (D.S.C. March 19, 2007)(finding inmate failed to state an Eighth Amendment claim where he complained he did not have a mattress for a number of days); Williams v. Anderson, 2006 WL 709209, * 13 (S.D.W.Va. March 16, 2006)(finding segregated inmate's inability to "exercise, keep personal hygiene items, change clothes or shower, take part in academic and religious programs or telephone family members" did not violate the Eighth Amendment); The conditions of confinement complained of by Plaintiff amounts to nothing more than a "routine discomfort [that] is part of the penalty that criminal offenders pay for their offenses against society." Accordingly, the undersigned respectfully recommends that Defendants be granted summary judgment as to the above condition of confinement challenge.

### B.     Exposure to Flooded Cell and Human Waste:

Next, the undersigned considers Plaintiff's claim that he was confined in a flooded cell contaminated with human waste for several days. "[A] prisoner's exposure to human waste may give rise to an Eighth Amendment violation. Williams v. Collier, 357 Fed.Appx. 532, 535 (4th Cir. 2009)(citing DeSpain v. Uphoff, 264 F.3d 965, 974-75 (10th Cir. 2001)). Exposure to human waste evokes both health and standards of dignity concerns embodied in the Eighth Amendment. McCord v. Maggio, 927 F.2d 844, 848 (5th Cir. 1991); Jones v. Solomon, 2018 WL 6247265, * 11 (W.D.N.C. Nov. 29, 2018)("Deprivation of basic sanitary conditions such as exposure to human waste without the ability to clean oneself can constitute an Eighth Amendment violation.") "[T]he mere smell or presence of human waste is not sufficiently serious to constitute a violation of the Eighth Amendment." Salmons v. Western Regional Jail, 2019 WL 5616916, * 6 (S.D.W.Va. Oct. 30, 2019)(J. Chambers). Although the sight and odor of human waste is distasteful, it does not rise to the level of cruel and unusual punishment. Canterbury v. Western Regional Jail, 2019 WL 6545328, * 12 (S.D.W.Va. Nov. 7, 2019), report and recommendation adopted by, 2019 WL 6598349 (S.D.W.Va. Dec. 4, 2019)(finding no constitutional violation where the plaintiff did not come into direct physical contact with human waste for an extended period of time); Harris v. FNU Connolly, 2016 WL 676468, * 5 (W.D.N.C. Feb. 18, 2016), aff'd, 667 Fed.Appx. 408 (4th Cir. 2016)(concluding that unsanitary cell conditions, including the presence of feces, urine, and vomit was less than ideal, but short term sanitation problems do not amount to constitutional violations); DePaola v. Ray, 2013 WL 4451236, * 10 (W.D.Va. July 22, 2013)(finding no violation of a basic human need or a sufficiently serious injury where a plaintiff allegedly "suffered from nausea [and psychological trauma] due to the smell of other inmates smearing their feces/urine while in the B-3 pod"). When determining whether exposure to human waste is cruel and unusual, such depends on both the duration and the severity of the exposure. See Willey v. Kirkpatrick, 801 F.3d 51, 68

35

(2015). In <u>Willey</u>, the Second Circuit set forth two examples:

> An exposure to human waste that lasts merely ten minutes, but that exposure takes the form of working in a well while facing "a shower of human excrement without protective clothing and equipment," a jury may find an Eighth Amendment violation. *See Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990). . . .   Likewise, a less severe exposure may be constitutionally permissible if rectified in short order but may become cruel and unusual with the prolonged passage of time. *See McCord*, 927 F.2d at 846-47(holding that occasional sewage backup onto cell floor on which inmate slept over two-year period, amount other conditions, violated the Eighth Amendment).

<u>Id.</u>; <u>also see</u> <u>Hutto v. Finney</u>, 437 U.S. 678, 686, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)(finding that confinement in a "filthy, overcrowded cell and a diet of [1,000 calories per day] might be tolerable for a few days and intolerably cruel for weeks or months); <u>Williams v. O'Brien</u>, 2014 WL 2864897, * 10 – 11 (N.D.W.Va. June 24, 2014)(an inmate's placement in a cell without running water, no sink, no toilet, half a mattress, being provided a bag for his bathroom needs, and no one removing the used bag for two days failed to state an Eighth Amendment claim where the inmate's exposure to such conditions was limited to two and a half days and inmate failed to allege "any harm more serious than temporary discomfort"). In <u>Shakka v. Smith</u>, the Fourth Circuit determined plaintiff failed to establish an Eighth Amendment violation where Plaintiff was provided with water and cleaning material but denied a shower for three days after human waste was thrown onto plaintiff and his surroundings. <u>Shakka v. Smith</u>, 71 F.3d 162, 167-68 (4th Cir. 1995). In the instant case, Plaintiff does not allege that he came into direct physical contact with human waste. Plaintiff merely alleges that he was confined in a cell for "several days" and there was human waste on the cell floor. As explained above, the mere smell or presence of human waste or body fluids does not rise to the level of a constitutional violation. Based on the foregoing, the undersigned finds that Plaintiff's above allegations fail to state a cognizable claim under the Eighth Amendment for which relief can be granted. See <u>Dellis v. Correctional Corp. of America</u>, 257 F.3d

508, 511 (6th Cir. 2001)(finding a flooded cell and inoperable toilet were temporary inconveniences that did not violate the Eighth Amendment); Harris v. FNU Connolly, 2016 WL 676468, * 5 (W.D.N.C. Feb. 18, 2016), aff'd, 667 Fed.Appx. 408 (4th Cir. 2016)(dismissing Eighth Amendment claim where inmate alleged he was held in a cell with "massive amount of urine, feces, and vomit on both the floor and walls" for 45 days as "courts have found no constitutional violation in other cases involving similar time periods when the prisoner was allegedly exposed to unsanitary conditions"); Joyner v. Patterson, 2014 WL 3909531, * 4 (D.S.C. Aug. 11, 2014), aff'd, 597 Fed.Appx. 748 (4th Cir. 2015)(finding no Eighth Amendment violation where inmate was provided infrequent and limited number of showers, subjected to filthy floors, showers, and food trays, and given a cell that on several occasions floods with toilet water containing urine and feces); The undersigned, therefore, respectfully recommends that Defendants be granted summary judgment as to the above condition of confinement challenge.

### C. Denial of Decontamination After Exposure to OC Spray:

Third, the undersigned considers Plaintiff's claim that he denied a shower and change of clothes for several days after being exposed to OC spray and body fluids (blood). Plaintiff contends that the nurse directed officers to provide Plaintiff with a shower, but such was denied. Plaintiff alleges he suffered from serious harm because he suffered extreme burning pain as a result of being denied a decontamination shower for several days after being exposed to OC spray. In his Declaration, Plaintiff states that he asked every Defendant to allow him to shower to remove the OC spray, but "no one allowed me for several days." (Document No. 45, p. 2.) Inmate Dixon declares that he started coughing when Plaintiff entered his cell due "to the OC spray that was on [Plaintiff's] clothes along with all the blood on his clothes." (Document No. 48, p. 2.) The denial of a decontamination shower for a period of days, or even hours, after an inmate is subjected to

OC spray can constitute an Eighth Amendment violation. Williams v. Benjamin, 77 F.3d 756, 768(4th Cir. 1996)(the denial of decontamination can give rise to an Eighth Amendment claim); also see Mann v. Failey, 578 Fed.Appx. 270, 274-57 (4th Cir. July 17, 2014)(noting that a reasonable jury could find plaintiff adequately established both the subjective and objective prongs of his Eighth Amendment claim where plaintiff swore that after being sprayed with OC spray, he repeatedly asked officers and medical staff for a shower, and experienced burning pain over his body for five days); Clement v. Gomez, 298 F.3d 898, 905 (9th Cir. 2002)(failure to decontaminate prisoners exposed to pepper spray may support a claim for the violation of the Eighth Amendment); Brown v. Coleman, 2021 WL 4037504, * 5 (W.D.Va. Sept. 3, 2021)(finding inmate's allegation of being denied a decontamination shower for one week after being subjected to OC spray created a genuine issue of material fact); Bomar v. Wetzel, 2020 WL 907641, * 5 (W.D.Pa. Feb. 2, 2020)("Courts have held that the failure to decontaminate prisoners or otherwise provide medical treatment for prisoners exposed to pepper spray can support a claim for a violation of the Eighth Amendment where the failure to treat the prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain."); Murphy v. Ortt, 2018 WL 1513007, * 7 (D.Md. March 26, 2018)(finding prisoner created a genuine issue of material fact where he alleged he was placed in a cell without running water for several hours after he was subjected to pepper spray). Viewing the evidence in a light most favorable to Plaintiff, the undersigned finds that Plaintiff has stated a cognizable claim under the Eighth Amendment that creates a genuine issue of material fact. Accordingly, the undersigned respectfully recommends that Defendants' Motion for Summary Judgment be denied as to Plaintiff's claim that Defendants violated his Eighth Amendments rights by denying Plaintiff decontamination after his exposure to OC spray.

**D.     Denial of Water and Food:**

Finally, the undersigned considers Plaintiff claim that he was deprived of water and uncontaminated food for several days. During Plaintiff's placement in Cell 6, Plaintiff declares that he was denied water and uncontaminated food for "4 or 5 days." (Document No. 45.) Plaintiff states he was denied food because his food trays were contaminated with human waste because the food trays were slid under the cell door on the floor that was covered in feces and urine. (Id.) Plaintiff further states that Cell 6 had no running water and "not once while I was in Cell 6 did I get a cup of water." (Id.) Plaintiff asserts that he "asked every CO that came to the A-1 Unit, such as Lt. Burton, CO Hood, CO Pauley, CO Houchins, CO Walters, CO Bowyer, CO Cox, CO Witt, LT Lilly, Capt. Warden, Capt. Dillon, Lt. Cook, Capt. Athy, Lt. Burrnett, and Warden Frances [and] none of them helped me at all." (Id.) Plaintiff declares that "once I felt I was going to die, I began to drink the toilet water to stay hydrated." (Id.) Plaintiff alleges that he suffered from hunger and dehydration. As stated above, prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish, 573 F.2d at 125; also see Chavarriaga v. New Jersey Dept. of Corrections, 806 F.3d 210, 228 (3rd Cir. 2015)("[A]llegations that prison personnel intentionally denied [inmate] access to potable water for three days on one occasion and two days on another raised her allegations to a level so that rather than charging a tolerable, though uncomfortable, set of conditions, she had been subject to a prohibited inhumane deprivation."); Spires v. Paul, 581 Fed.Appx. 786, 793 (11th Cir. 2014)(finding the deprivation of potable water for several days is a denial of a basic need and the minimal civilized measures of life's necessities); Dellis, supra, 257 F.3d at 512(The denial of drinking water for three straight days can constitute an Eighth Amendment violation; Tyree v. Brooks, 2009 WL 2232455, * 2 (W.D.Va. July 24, 2009)(citing Despain v. Uphoff, 264 F.3d 965, 972 (10th Cir. 2001)(finding Eighth Amendment

violation where inmates were served food from a cart that allowed water contaminated with human waste to contact the inmates' food); but see Lockamy v. Rodriguez, 402 Fed.Appx. 950, 951 (5th Cir. 2010)(absent an allegation of an injury as a result of missing meals, the deprivation of six meals during a 54 hour period was insufficient to state a claim); Cunningham v. Jones, 667 F.2d 565, 566 (6th Cir. 1982)(inmate's Eighth Amendment rights were not violated when he was served only one meal a day for 15 consecutive days were Defendants demonstrated that the one meal furnished was sufficient caloric content to maintain normal health for the 15 days involved); Laufgas v. Speziale, 263 Fed.Appx. 192, 198 (3rd Cir. 2008)("While prisoners are guaranteed a nutritionally adequate diet under the Eighth Amendment, there is no constitutional right to hot meals."); Evans v. Jabe, 2014 WL 202023, * 6 (E.D.Va. Jan. 17, 2014)(finding inmate failed to state a claim where he complained for an incomplete or tardy breakfast on six occasions and there was no evidence of an injury). Viewing the evidence in a light most favorable to Plaintiff, the undersigned finds that Plaintiff has stated a cognizable claim under the Eighth Amendment that creates a genuine issue of material fact. The denial of food and water for four to five days could constitute a substantial risk of serious harm resulting from the challenged conditions of confinement. Accordingly, the undersigned respectfully recommends that Defendants' Motion for Summary Judgment be denied as to Plaintiff's claim that Defendants violated his Eighth Amendments rights by denying Plaintiff adequate food and water.

**3.       Failure to Protect Claim:**

In his Complaint, Plaintiff alleges that Defendants encouraged other inmates to attack Plaintiff when he was placed in segregation. (Document No. 2.) Plaintiff states that he was first placed in a cell with Inmate Jones, and Defendant Whitt told Inmate Jones, "Do that and my word you'll get out today." (Id.) Plaintiff alleges that a short time later, Inmate Jones "began to punch

40

and kick me in my head. I grabbed his leg and pulled him down, and we began to fight like dogs." (Id.) Plaintiff alleges that the other inmate in the cell yelled for help, and correctional officers opened the door and both inmates stopped fighting. (Id.) Plaintiff alleges that he was then taken to another cell that was shared with Inmate Dixon. (Id.) Plaintiff claims that Inmate Dixon stated "Hell no. I'm not having no celly and I'm damn sure not living with no ni*ger." (Id.) Plaintiff states that Officer Dillon refused Plaintiff's request to be placed in a different cell. (Id.) Specifically, Plaintiff claims that Defendant Dillon responded as follows: "Oh you're going in there even if we have to throw you in there. You all both assaulted my staff; I don't care if y'all kill each other in there." (Id.) Plaintiff was placed in the cell with Inmate Dixon, who continued to threaten Plaintiff." (Id., p. 6.) Subsequently, Plaintiff contends that Inmate Jones came to his cell door and stated the following: "I had to do that because they said if I did that, they would let me out of the hole and not ad seq me for the knife." (Id.) Plaintiff contends that as soon as Inmate Jones left, Inmate Dixon punched him in the back of the head several times. (Id.) Plaintiff alleges that he yelled for help, but it took more than five minutes for a correctional officer to arrive at the cell. (Id.) Plaintiff contends that he informed the officer of the attack and then requested to be moved to protective custody. (Id.) Plaintiff alleges that the officer responded as follows: "Fight him like you fault the CO this morning . . . You just beat a CO up, now you're scared for your life? You are a bitch. I wish you would have put your hands on me! You are not leaving that cell. Now shut the f**k up whore." (Id., pp. 6 – 7.) Plaintiff contends that he then pressed the call button again reporting that Plaintiff was in fear for his life, but no one took any action. (Id., p. 7.) Plaintiff further alleges that Inmate Dixon told Plaintiff that both food trays were his because Plaintiff had to pay "in trays to stay in this cell." (Id.) Plaintiff alleges that Inmate Dixon then "punched me in my head, I grabbed him and got him in the choke hold and held him till he was asleep." (Id.)

Plaintiff states that he then reported the incident to officers and requested to be removed from the cell, but no action was taken. (<u>Id.</u>, p. 8.) Plaintiff alleges that when Inmate Dixon "woke up," he continued to threaten Plaintiff. (<u>Id.</u>) Plaintiff acknowledges that he was then removed from the cell. (<u>Id.</u>)

In their Motion for Summary Judgment, Defendants argue that the Plaintiff fails to establish that any Defendant was deliberately indifferent to a known risk to Plaintiff's safety from his cellmates. (Document No. 40 and Document No. 41, pp. 15 – 17.) Defendants argue that "Plaintiff has no evidence that any Defendant had actual knowledge that any inmate posed substantial risk of harm to the Plaintiff and that any named Defendant disregarded that risk." (<u>Id.</u>, p. 16.) Accordingly, Defendants argue that they are entitled to summary judgment as to the above claim. (<u>Id.</u>, p. 17.)

In Response, Plaintiff argues that Defendants Burton, Witt, Bowyer, Cox, Lilly, Cook, Warden, Dillon, Athy, Burrnett, and Francis incited other inmates to attack Plaintiff by offering the inmates "release from the hole." (Document No. 44.) Plaintiff contends that Defendants were directly responsible for Plaintiff being attacked by Inmates Jones and Dixon. (<u>Id.</u>) As Exhibits, Plaintiff filed the following: (1) Plaintiff's Declaration (Document No. 45); and (2) The Declaration of Inmate Dixon (Document No. 48).

In Plaintiff's Declaration, Plaintiff states that he was then taken to A1 "where CO Witt told several inmates to 'fu*k me up & they will get out early.'" (<u>Id.</u>) Plaintiff asserts that he was "assaulted by Emmanuel Jones in A-1, cell 5, then assaulted again by Inmate Dixon [in] A-1, cell 8." (<u>Id.</u>) Plaintiff states that Defendants Burton, Witt, Bowyer, Cox, Lilly, Cook, Warden, Dillon, Athy, Burrnett, and Francis "all knew about the assault and were asked by [Plaintiff] numerous of times, for more than 8 days, to be moved." (<u>Id.</u>) Plaintiff acknowledges that after eight days, he

was moved to Cell 6. (Id.)

In Inmate Dixon's Declaration, he states that he was housed in A-1, Cell 8 with Plaintiff on or about January 27, 2020. (Document No. 48.) Inmate Dixon states that Plaintiff was initially "placed in a cell upstairs." (Id.) Inmate Dixon explains that subsequently officers brought Plaintiff to his cell (Cell 8) and Inmate Dixon "told officers I'm not living with any other inmates." (Id.) Inmate Dixon states that Plaintiff also informed officers that "he didn't want to live with me either." (Id.) Inmate Dixon asserts that "officers said something like 'You both assaulted my officers, you're living together. I don't care if you kill each other.'" (Id.) Inmate Dixon states that Plaintiff then "told the COs he was scared for his life and didn't want to live in the cell with me, to put him in protective custody." (Id.) Inmate Dixon acknowledges that he and Plaintiff had "a few physical altercations while in the cell" and officers ignored Plaintiff's request for "protective custody." (Id.) Inmate Dixon asserts that "days later," Plaintiff as moved to Cell 6, in A-1. (Id.)

The Eighth Amendment requires prison officials to "protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833, 114 S.Ct. at 1977. Prison officials must take "reasonable measure to guarantee the safety of the inmates." Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); also see Farmer, 511 U.S. at 833, 114 S.Ct. at 1977("The Government and its officials are not free to let the state of nature take its course."). The prisoner, however, bears the burden of demonstrating that prison officials violated the Eighth Amendment and "that burden is a heavy one." Whitley, 475 U.S. at 325, 106 S.Ct. at 1087. Further, not every "injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834, 114 S.Ct. at 1977. The Supreme Court has outlined two requirements for a failure to protect claim under the Eighth Amendment. Id. First, "a prison official's act or omission must result in the denial of 'the

minimal civilized measure of life's necessities.'" Id.(quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). In other words, the denial of the constitutional right must be "sufficiently serious." Id.; also see Danser v. Stansberry, 772 F.3d 340, 346-47 (4th Cir. 2014)(finding that a "prisoner must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury"). Second, the prison official must have a "sufficiently culpable state of mind" meaning the official either purposefully caused the harm or acted with "deliberate indifference." Id.

Applying the above standard, the undersigned finds that Plaintiff cannot establish that he was subjected to a substantial risk of serious harm. The record is completely void of any allegation or indication that Plaintiff suffered any injuries from his physical altercations with Inmate Jones or Inmate Dixon. The lack of any allegation or indication that Plaintiff suffered any injuries suggest there was no serious danger. See Brown v. Department of Public Safety and Correctional Services, 383 F.Supp.3d 519, * 548 (D.Md. May 13, 2019)(finding no deliberate indifference where "[t]here is no evidence that either Plaintiff experienced anything beyond the ordinary jailhouse scuffle in which nearly every inmate is involved, unfortunately, at some point or another."). Furthermore, Plaintiff indicates that he was the victor in the physical altercations. Plaintiff conclusory statement that his life was placed in jeopardy is insufficient. The undersigned, therefore, respectfully recommends that the District Court grant Defendants' Motion for Summary Judgment concerning his Eighth Amendment failure to protect claim.

**4.**   **Qualified Immunity:**

In their Motion for Summary Judgment, Defendants argue that Plaintiff's claims are barred against all of the Defendants by the doctrine of qualified immunity. (Document No. 40 and Document No. 41, pp. 17 – 18.) Specifically, Defendants argue that they are entitled to qualified

immunity because "the Plaintiff has not developed evidence that the Defendants violated clearly established statutory or constitutional rights of which a reasonable officer would have known." (Id.)

In Response, Plaintiff argues that Defendants are not entitled to qualified immunity. (Document No. 44, p. 5.) Plaintiff argues that "Defendants' arguments that they're entitled to qualified immunity for the unconstitutional conduct described herein has been decided clearly in almost every circuit court in the U.S." (Id.) Thus, Plaintiff concludes that "any argument of qualified immunity in favor of the defendants would simply be unjust." (Id.)

Courts have established qualified immunity for government officials in consideration of a number of factors including the substantial cost of litigation against government officials, the distraction of government officials from their public responsibilities and the disincentive to responsible and capable persons to accept government positions if there is no protection against suits accusing them of misconduct in the performance of their public duties. Government officials performing discretionary functions are generally protected from civil damages liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In determining the validity of a qualified immunity defense, the Court should be guided by a two-prong test: (1) whether the facts viewed in the light most favorable to the Plaintiff establish a deprivation of an actual constitutional right; and (2) whether that right was clearly established at the time of the purported violation. Id. The sequence of the steps is immaterial following Pearson. The Court may exercise discretion in deciding which of the two prongs "should be addressed first in light of the circumstances in the particular case at hand."

Id. at 818. "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Cooper v. Sheehan, 735 F.3d 153, 158 *4th Cir. 2013)(internal quotation marks and citations omitted).

In the instant case, Defendants argue they are entitled to qualified immunity because Plaintiff cannot establish that Defendants violated his constitutional rights. Defendants appear to acknowledge that the Eighth Amendment right to be free from cruel and unusual punishment was clearly established at the time of the allegation violations. Defendants do not dispute that it was well established that the time of the alleged constitutional violations that sentenced prisoners were entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety" under the Eighth Amendment. Defendants, however, argue that "Plaintiff has not developed evidence that Defendants violated clearly established statutory or constitutional rights." As explained above, the undersigned finds that Plaintiff has produced sufficient evidence for the jury to return a verdict in Plaintiff's favor considering his Eighth Amendment claims that Defendants denied Plaintiff water and uncontaminated food for several days and a decontamination shower after Plaintiff's exposure to OC spray. Plaintiff has provided his own Declaration and the Declaration of Inmate Dixon, which supports Plaintiff's claim that each Defendant was aware that the above denials created an excessive risk to Plaintiff's health and safety and each deliberately failed to act. See Makdessi, supra, 789 F.3d at137-38(stating that "even under the subjective standard, a prison official cannot hide behind an excuse that he was unaware of a risk, no matter how obvious"); Porter, supra, 923 F.3d at 361("an obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate"). As explained above, the undersigned has concluded there are issues of material fact regarding Defendants' denial water, uncontaminated food, and decontamination after exposure to OC spray. For the reasons explained

above, the undersigned finds that when viewing the facts in a light most favorable to Plaintiff, Plaintiff could establish a violation of his Eighth Amendment rights. When both the resolution of the qualified immunity question and the case itself depends upon a determination of what actually happened, summary judgment on grounds of qualified immunity is not proper. Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir. 1995); Hinojos v. Bowers, 2015 WL 4878812, * 8 (D.S.C. Aug. 14, 2015)(citations omitted)("[T]he court holds that there is a genuine issue of material fact as to whether [the defendant] used excessive force against [plaintiff]; therefore, the court cannot determine at the summary judgment phase that [the defendant's] actions were objectively reasonable for purposes of granting qualified immunity.") The undersigned, therefore, respectfully recommends that Defendants' Motion for Summary Judgment be denied concerning their claim of qualified immunity.

**5.** **Supervisory Liability:**

Finally, Defendants argue that they cannot be liable under Section 1983 on a theory of supervisory liability. (Document No. 40 and Document No. 41, pp. 19 – 20.) Thus, Defendants argue "to the extent Plaintiff has asserted a supervisory liability claim under § 1983 against any Defendant, they fail as a matter of law." (Document No. 41, p. 20.)

In Response, Plaintiff states that he is not asserting any claim based on *respondeat superior*. (Document No. 44, p. 3.) Plaintiff argues that all claims asserted against Defendants are based upon "direct personal knowledge and involvement" by each Defendant. (Id.) Thus, Plaintiff notes that there are no claims based upon "an argument of improper respondeat superior liability." (Id.)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. * * * Because vicarious liability is

inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant,

through the officials own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556

U.S. 662, 676, 129 S.Ct. 1936, 1948, 173 L.Ed.2d 868 (2009); see also Trulock v. Freeh, 275 F.3d

391, 402 (4th Cir. 2001), cert. denied, 537 U.S. 1045 , 123 S.Ct. 621, 154 L.Ed.2d 517 (2002)("In

a Bivens suit there is no respondeat superior liability. * * * Instead, liability is personal, based

upon each defendant's own constitutional violations." (Citation omitted.)); Monell, supra, 436 U.S.

at 694, 98 S.Ct. at 2018("the mere right to control without any control or direction having been

exercised and without any failure to supervise is not enough to support § 1983 liability"). Liability

can be premised, however, "on a recognition that supervisory indifference or 'tacit authorization

of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on

those committed to their care." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984), cert. denied,

470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). To establish liability under Section 1983

for a supervisory defendant, the plaintiff must establish the following:

> (1) that the supervisor had actual or constructive knowledge that his subordinate
> was engaged in conduct that posed "a pervasive and unreasonable risk" of
> constitutional injury to citizens like the plaintiff; (2) that the supervisor's response
> to that knowledge was so inadequate as to show "deliberate indifference to or tacit
> authorization of the alleged offensive practices;" and (3) that there was an
> "affirmative causal link" between the supervisor's inaction and the particular
> constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). Thus, a plaintiff must show "a pervasive and

unreasonable risk of harm from some specified source and that the supervisor's corrective inaction

amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" Slakan, 737

F.2d at 373. Evidence of a supervisor's continued inaction in the face of documented widespread

abuses provides an independent basis for finding she either was deliberately indifferent or

acquiesced in the constitutionally offensive conduct of her subordinates. Id. A supervisor's mere

knowledge of a subordinate's unconstitutional conduct is not enough. Rather, Section 1983 liability may be imposed upon a supervisor only on the basis of purposeful "violations of his or her supervisory responsibilities." <u>Ashcroft</u>, 556 U.S. at 676, 129 S.Ct. at 1949. Thus, the inquiry for the Court is whether the Defendant individually "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." <u>Moore v. Winebrenner</u>, 927 F.2d 1312, 1315 (4th Cir. 1991).

Based upon a review of Plaintiff's Complaint, the undersigned finds that Plaintiff appears to be asserting his claim based upon direct personal involvement by each Defendant. Accordingly, the undersigned recommends that Defendants' Motion for Summary Judgment based upon Plaintiff's alleged failure to establish supervisory liability be denied as moot.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT in part and DENY in part** Defendants' Motion for Summary Judgment (Document No. 40). Specifically, the undersigned recommends that Defendants' Motion for Summary Judgment be granted as to following: (1) Plaintiff's excessive force claim; (2) Plaintiff's unconstitutional conditions of confinement claim based upon the denial of a mat from 5 a.m. to 11 p.m. for a 30 day period, showering being restricted to 4 to 5 times in a 30 day period, and being confined in a flooded cell contaminate with human waste for several days; and (3) Plaintiff's failure to protect claim. The undersigned recommends that Defendants' Motion for Summary Judgment be denied as to Plaintiff's unconstitutional conditions of confinement claim based upon the following: (1) The denial of a decontamination shower and clean clothing for several days after being exposed to OC spray; and (2) The denial of water and uncontaminated

49

food for several days.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Frank W. Volk. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Volk and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: June 17, 2022.

Omar J. Aboulhosn
United States Magistrate Judge